THE STATE, EX REL. BROWN, ATTY. GEN., APPELLANT, *v.* HOME PRO ENTERPRISES, INC., ET AL., APPELLEES.

[Cite as State, ex rel. Brown, *v.* Home Pro Enterprises, Inc. (1982), 1 Ohio St. 3d 255.]

(No. 81-1578—Decided August 18, 1982.)

*Mr. William J. Brown,* attorney general, and *Mr. Dominic J. Hanket,* for appellant.

*Messrs. Malik, Malik, Knapp & Kigerl, Mr. John J. Malik, Jr.,* and *Mr. Daniel L. Frizzi, Jr.,* for appellees.

HOLMES, J. The question presented by this appeal is whether the appellees' activities are subject to the provisions of R.C. Chapter 1513.[4] R.C. 1513.07(A) prohibits any "licensed operator" from conducting a "strip mining operation" unless a permit has been issued by the chief of the division of reclamation.[5] Thus, appellees will be subject to the permit requirements if they are deemed to be "operators" and their activity is a "strip mining operation."

An "operator" is defined by R.C. 1513.01(G) as:

"* * * any person engaged in strip mining who removes or intends to remove more than two hundred fifty tons of coal from the earth by strip mining within twelve successive calendar months or who removes overburden to determine the location, quality, or quantity of a natural coal deposit, but does not include persons whose coal extraction is incidental to the removal of other minerals as defined in division (P) of this section."

Since appellees removed more than 250 tons of coal within a 12-month

---

[4] R.C. Chapter 1513 was amended by Am. Sub. H. B. No. 1051, effective September 1, 1981. Appellant urges us to apply the amended version to this case. However, section 4 of Am. Sub. H. B. No. 1051 states that it shall not apply to pending actions. Therefore, we decline to apply the amended version. Consequently, all quotations in this opinion of R.C. Chapter 1513 are from the code as it existed prior to amendment by Am. Sub. H. B. No. 1051.

[5] R.C. 1513.06 requires all operators to obtain licenses. Failure to get a license does not exempt one from the permit requirement on the basis that R.C. 1513.07(A) applies only to "licensed operators."

period, the key question is whether they were "engaged in strip mining."[6] The courts below held that the appellees were not engaged in strip mining. In reaching this conclusion, the courts determined that one is not engaged in strip mining if done on only an occasional basis. This would be much like the "occasional sale of goods" under the Uniform Commercial Code.

We disagree with that conclusion. The decisions[7] relied upon by the trial court below involve regulatory schemes which control activities of those engaged in the *business* of that activity. The General Assembly chose to regulate those engaged in strip mining — not just those engaged in the business of strip mining. That appellees may be classed as "occasional strip miners" is of no import.

Further, the definition of operator, quoted above, contains one exemption from the regulatory scheme for those who could be considered occasional strip miners. To be an operator, one must remove, or intend to remove, more than 250 tons of coal in a 12-month period. Under the rule of statutory construction, *expressio unius est exclusio alterius,* we decline to create another exemption for those who are not in the business of strip mining.

The General Assembly has directed regulation of all who engage in an activity which is strip mining. This is what the appellees were doing; therefore, we conclude that appellees were "operators" as that term is defined by R.C. 1513.01(G).

Next, we must decide whether the activity that appellees were conducting was a "strip mining operation."[8] The Court of Appeals reasoned that since the removal of coal was incidental to commercial development, it was not a strip mining operation. To reach this conclusion, the Court of Appeals relied upon the fact that R.C. Chapter 1513 is directed toward "reclamation," and reasoned that in as much as the appellees were commercially developing the site, "reclamation" would make little sense. Because we feel that this reasoning interprets both the goals of the statutory scheme and the concept of reclamation too narrowly, we disagree and hold that appellees were conducting a strip mining operation.

---

[6] "Strip mining" is defined by R.C. 1513.01(P) as:

"* * * all or any part of the process followed in the production of coal from a natural deposit, whereby the coal may be extracted after removing overburden, including mining by the auger method or any similar method which penetrates a mineral seam and removes coal directly through a series of openings made by a machine which enters the seam from a surface excavation, or the removing of overburden for the purpose of determining the location, quality, or quantity of a natural coal deposit, or activities conducted on the surface of lands in connection with; but does not include all or any part of a process whereby the extraction of coal is incidental to the extraction of other minerals, and the weight of coal extracted during the year is less than one-sixth the total weight of minerals removed during the year, including coal."

Clearly, appellees' activity was strip mining.

[7] See, *e.g., United States* v. *Tarr* (C.A.1, 1978), 589 F.2d 55; *Dane* v. *Brown* (C.A.1, 1934), 70 F.2d 164; *Fillippo* v. *S. Bonaccurso & Sons, Inc.* (E.D.Pa. 1978), 466 F. Supp. 1008.

[8] "Strip mining operation" is defined by R.C. 1513.01(F).

First, it must be pointed out that nowhere in R.C. Chapters 1513 and 1514 is there an exemption from regulation for those who remove coal as an incident to commercial development. Indeed, the General Assembly contemplated that this might be done, since R.C. 1513.07(A)(8) directs an operator to include in an application for a permit his future plans for the land to be mined. Among those future uses anticipated is commercial development. However, our analysis does not stop there. First we examine the goals or purpose of the statutory scheme; then we turn to the concept of reclamation as used in this scheme.

Broadly stated, the purpose of R.C. Chapters 1513 and 1514 is the alleviation of environmental harm caused by strip mining.[9] This harm is caused not just by abandoned strip mines, but also by the mining process itself. Strip mining itself can result in the discharge of acid water into our streams and is a major contributor to sedimentation of rivers and streams through soil erosion. R.C. 1513.07(A)(8) addresses this concern and requires permit applications to state how these problems are to be avoided. To exempt appellees, and others similarly situated, from regulation would likewise exempt them from this requirement. It would undermine the purposes of the statutory scheme by allowing a class of people to remove coal in a manner that could be environmentally harmful.

The concept of reclamation,[10] as used in R.C. Chapters 1513 and 1514, does not contemplate that all projects must be backfilled and contoured to their original grade. R.C. 1513.07(A)(8) exempts, from this requirement, land whose highest and best use does not require it. Thus, where the ultimate use of the land is commercial development, it may be assumed that the reclamation requirements will differ from those where it contemplated that the land will return to a natural state.

Based on the foregoing, we conclude that appellees were conducting a "strip mining operation." In light of this conclusion, and the determination that appellees are "operators," we hold that they are subject to the permit requirements of R.C. 1513.07(A).

Accordingly, the judgment is reversed and the cause remanded with instructions to grant appellant a permanent injunction.

*Judgment reversed and cause remanded.*

CELEBREZZE, C.J., W. BROWN, SWEENEY and LOCHER, JJ., concur.
C. BROWN and KRUPANSKY, JJ., dissent.

---

[9] The literature is replete with studies on the environmental harm caused by strip mining. See, *e.g.,* Reitze, Old King Coal and the Merry Rapists of Appalachia, 22 Case West. L. Rev. 650.

[10] R.C. 1513.01(M) reads:

" 'Reclamation' means backfilling, grading, resoiling, planting, and other work which has the effect of restoring an area of land affected by strip mining so that it may be used for forest growth, grazing, agricultural, recreational, or wildlife purpose, or some other useful purpose of equal or greater value."

CLIFFORD F. BROWN, J. dissenting. As stated in the well-reasoned dissent of Justice Blanche Krupansky, a building contractor preparing a site for a commercial development is not "engaged in strip mining" as that phrase is used in the unamended version of R.C. 1513.01(G).[11] Because I cannot believe that the chapter dealing with "Reclamation of Strip-Mined Land" was ever intended to require a Division of Reclamation permit for a commercial developer who, incidental to preparing a site for buildings and parking lots, encounters a seam of coal, I dissent.

As evidenced by the chapter heading and thrust of the statute, the General Assembly enacted R.C. Chapter 1513 to require that strip-mined land be reclaimed. Reclamation was defined, prior to the 1981 amendment, as "backfilling, grading, resoiling, planting, and other work *to restore an area of land* affected by strip mining so that it may be *used for forest growth, grazing, agricultural, recreational, or wildlife purpose, or some other useful purpose of equal or greater value.*" (Emphasis added.) R.C. 1513.01(M). See footnote 10.

The fact seemingly ignored by this court is that this activity was not within the scope of the reclamation statute. Here, the area of land affected by strip mining, through "backfilling, grading, resoiling, planting, and other work," will be developed for a higher, commercial use. It will not be reclaimed in the sense it will be restored to its prior state. It is physically impossible to both restore the land and develop a shopping center on the same site.

Moreover, the General Assembly defined strip mining as "all or any part of the process followed in the production of coal from a natural deposit, whereby the coal may be extracted after removing overburden * * *." R.C. 1513.01(P). In this language the scope of the statute was confined to operations conducted for the purpose of producing coal, not actions taken to build shopping centers or the like.

The majority posits as the key question in this case whether the appellees were "engaged in strip mining" as used in paragraph R.C. 1513.01(G). See footnote 6. In concluding that appellees were "engaged in strip mining," the majority ignores the salient facts in this case and the accurate analysis of the law applicable thereto as stated by Judge Joseph O'Neill on behalf of a unanimous Court of Appeals as follows:

"The trial judge, in considering this statute, held that it did not apply to appellees because they were not conducting a 'strip mining operation.' He relied upon paragraph (G), Sec. 1513.01 O.R.C., which defines an 'operator' as '* * * any person engaged in strip mining.' Paragraph (8) of the stipulation of facts very specifically describes the appellees as being engaged in the preparation of a 'commercial development.' Upon this agreed fact, the trial

---

[11] The construction project of the appellees also does not fit within the definition of "operation" or "strip mining operation" at R.C. 1513.01(F). Appellees' activity likewise falls short of fulfilling the definition of "strip mining" in R.C. 1513.01(P) and the definition of "operator" in paragraph R.C. 1513.01(G).

judge concluded that although the appellees were incidentally doing some strip mining, they were not 'engaged in strip mining.'

"* * *

"Upon the stipulation of facts the activities conducted by appellees were conducted on the surface of lands in connection with 'commercial development' (par. 8) not in connection with a strip mine. Any excavation which appellees performed was for the purpose of site preparation and not for 'the purpose of obtaining coal.' Accordingly, appellees were not, by definition, engaging in strip mining nor were they conducting a strip mining operation and thus were not required to secure a permit pursuant to Sections 1513.06 and 1513.07 O.R.C."

Because the concepts of reclamation and strip mining, as defined and used in R.C. Chapter 1513, do not include land being prepared for a higher use, appellee is not an "operator" "engaged in strip mining." He is a shopping center developer who must now unnecessarily run the gauntlet of Division of Reclamation permit procedure in order to develop property for a higher and more beneficial use.[12]

---

[12] It should be noted that today's decision requires the appellees to obtain a "permit" to conduct a "strip mining operation" under the provisions of R.C. 1513.07(A) to complete the building construction on their site. However, the Chief of the Division of Reclamation is under the statutory duty to deny the issuance of such a permit pursuant to the mandatory language of the unamended version of R.C. 1513.07(A) which was in effect at the time appellees applied for their permit. That section states as follows:

"* * * However, the chief shall issue an order denying a permit if he finds that the applicant, * * * has substantially or materially failed to comply with Chapter 1513. of the Revised Code, which failure may consist of one or more violations thereof, a rule adopted thereunder, or an order of the chief, and the chief shall revoke the license of any person who purposely misrepresents or omits any material fact in the application for the permit or an amendment to a permit."

Inasmuch as our decision today establishes as the law of the case that appellees have "substantially or materially failed to comply with Chapter 1513 of the Revised Code" by determining that appellees "were conducting 'a strip mining operation' " without a permit, the Chief of the Division of Reclamation is therefore statutorily precluded from issuing a permit.

Accordingly, appellees and Belmont County are faced with an environmental eyesore, a large crater adjacent to a large pile of coal, which the appellees, the Chief of the Division of Reclamation and the lower courts must maintain in perpetuity by reason of the permanent injunction instructed to be granted to appellant by this court.

Thus today's decision creates an impasse: The Division of Reclamation can issue no permit and, under the permanent injunction, appellees can neither remove the coal nor build. Moreover, no further judicial relief is available to either party by the terms of the permanent injunction. Accordingly, by obtaining through appellant more judicial relief than he needed, the Chief of the Division of Reclamation has not only dug a large hole for himself from which he cannot be extricated, but, insofar as can be determined by the record before us, has imposed a permanent eyesore on his community. Such precedent may even encourage the Division of Reclamation to extend its grab for unauthorized power elsewhere in Ohio.

This surely was not the intent of the General Assembly in enacting R.C. Chapter 1513. Indeed, by precluding any further excavation of coal or building construction on the site permanently, this court ignores the presumptions to be afforded legislative enactments under the basic rules of statutory construction: that a just and reasonable result, feasible of execution, is intended.

KRUPANSKY, J., dissenting. In my opinion, the majority construes the phrase "engaged in strip mining," found in former R.C. 1513.01(G), too broadly, and unnecessarily finds appellees are subject to the licensing and permitting provisions of former R.C. Chapter 1513. Therefore, I respectfully dissent.

While there are no cases explicitly defining "engaged in strip mining," there are numerous cases construing the term "engaged in" in conjunction with other activities. In *Fillippo* v. *S. Bonaccurso & Sons, Inc.* (1978), 466 F. Supp. 1008, at page 1017, for instance, the United States District Court for the Eastern District of Pennsylvania stated:

"* * * Being *engaged* in an activity requires more than a single act or transaction or an occasional participation. * * *"

Clearly, the phrase "engaged in" connotes a continuous activity, consciously pursued *and not an incidental by-product of another project,* such as present herein, viz., the removal of coal incidental to construction of a commercial development.

Indeed, a closer investigation of the circumstances in this case reveals this coal proved to be a burden to the defendants. The coal was of very poor quality, and thus, it was not economically advantageous for the defendants to extract the coal. However, it was impossible to commercially develop the site without first removing this underlying layer of coal. Therefore, the defendants were literally *compelled* to remove the coal prior to commencing their development. It seems somewhat ludicrous to declare defendants are "engaged in strip mining" when they were literally forced to extract this coal.

Likewise, the phrase "process followed in the production of coal" found in the former definition of "strip mining," also evokes visions of an individual whose purpose is the extraction of coal, rather than one whose activities only incidentally include isolated acts of coal extraction. Appellees' purpose, *as stipulated by the parties,* is the preparation of the site *for commercial development.* After much consideration, I do not feel the above-quoted phrase is broad enough to encompass a party, such as appellees, involved solely in commercial development. As stated by the majority, "[p]rior to Home Pro applying for this permit, it had never encountered, removed, marketed, or otherwise dealt with coal in its activities as a commercial developer."

The majority concludes that excluding individuals or businesses such as appellees from the requirements of former R.C. Chapter 1513 acts to thwart

R.C. 1.47(C) and (D). The judicial snarl thus generated is more government bureaucracy and red tape than we bargained for or have the right to expect, and is much more than the legislature intended.

The four lower court judges, all natives of the Belmont County area, possessed a sufficient intuitive sense of justice to recognize that appellees were building contractors and not strip mining operators subject to R.C. Chapter 1513. I am in agreement with them and believe the only solution based on common sense is judicial relief fashioned so that appellees can complete construction of their shopping center without a strip mining permit or encountering other bureaucratic hamstringing.

the underlying purpose of the strip-mining and reclamation laws, *e.g.*, regulating the extraction of coal in a manner which is both economically efficient and environmentally safe. The most persuasive argument against this assertion becomes apparent when one examines the federal statutes in this area. Most specifically, Section 1278(2), Title 30, U.S. Code, explicitly excludes "the extraction of coal for commercial purposes where the surface mining operation affects two acres or less * * *." Recognizing the goals of the federal government to be co-extensive with the goals of the state of Ohio in this area, it seems the determination to exclude parties such as appellees from the mandates of the surface mining laws, while not controlling, should certainly be weighed heavily against the argument to the contrary.

Furthermore, the majority also points out R.C. 1513.07(A)(8) directs an operator to include his "future plans" in the permit application; interestingly, "commercial development" is included as one of the future uses. From this the majority concludes individuals commercially developing land must obtain a strip-mining permit. However, reading R.C. 1513.07(A)(8) in its entirety militates against the majority's conclusion.

R.C. 1513.07(A)(8) provides in relevant part:

"* * * The chief shall disapprove any plan or amended plan which does not provide for the immediate establishment of covering by grasses, legumes, or similar plants in order to prevent soil erosion, including a preliminary planting of such cover in areas which are to be planted in trees. * * *"

A mandatory requirement for the immediate covering of a site by "grasses, legumes, or similar plants" is totally inconsistent with that site's commercial development. Why would one plant grass on land which is to be immediately covered by a building foundation, asphalt or concrete? Must such an individual, after removal of coal, plant "grasses, legumes, or similar plants," wait for them to grow and once again clear the land for commercial development? To conduct an intermediate phase of covering the land with grasses and plants would be an obvious exercise in futility.

In view of all the above, I conclude the statutes pertaining to the reclamation of strip-mined land, found in former R.C. Chapter 1513, did not extend to the regulation of individuals engaged in the commercial development of .7 acre plot of land who are forced to extract coal from the site prior to beginning their project.

Accordingly, I would affirm the judgment of the Court of Appeals.

C. Brown, J., concurs in the foregoing dissenting opinion.